## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

JAMES H. SMITH, JR. ob/o
LAURIE K. SMITH (deceased)

                Plaintiff,

vs.                                   CASE NO: 2:06-cv-422-FtM-29SPC

MICHAEL J. ASTRUE,[1]
Commissioner of Social Security,

_____

### REPORT AND RECOMMENDATION[2]

      This matter comes before the Court on the Plaintiff, James H. Smith, Jr. o/b/o Laurie K.

Smith's, Complaint Seeking Review of the Final Decision of the Commissioner of Social Security

(Commissioner) denying the Plaintiff's Claim for Disability Insurance (Doc. #1) filed on August 18,

2006. The Plaintiff filed his Memorandum of Law in Support of the Complaint (Doc. #11) on

December 22, 2006.    The Commissioner filed a Memorandum of Law in Support of the

Commissioner's Decision (Doc. #14) on February 21, 2007.   Thus, the Motion is now ripe for

review.

      The Undersigned has reviewed the record, including a transcript of the proceedings before

the Administrative Law Judge (ALJ), the exhibits filed and administrative record, and the pleadings

---

[1]Michael J. Astrue became the Commissioner of Social Security on February 12, 2007.   Pursuant to Rule 25(d)(1), the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted for Jo Anne B. Barnhart as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2]This Report and Recommendation addresses only the issues brought up for review by the District Court pursuant to 28 U.S.C. § 405(g).

and memoranda submitted by the parties in this case.

## FACTS

### *Procedural History*

The Plaintiff filed an application for a period of Disability and Disability Insurance Benefits. The Plaintiff alleged an onset disability date of December 21, 2001. (Tr. 29).  The application was denied initially and upon reconsideration.  (Tr. 29).  The Plaintiff timely filed a request for hearing on April 20, 2004.  (Tr. 24).  A hearing was held before the Honorable Thurman Anderson, Administrative Law Judge (ALJ) on May 25, 2004.  (Tr. 306-334).  On November 10, 2004, the ALJ issued an unfavorable decision.  (Tr. 29-38).  The Plaintiff filed a Request for Review of the Hearing Decision with the Appeals Council.  (Tr. 23-25).  On January 18, 2006, the Appeals Counsel notified the Plaintiff that it had granted the request for review.  (Tr. 8).  In that notice, the Council proposed to issue a decision finding the severity of the claimant's impairment met the criteria of section 13.13A and 13.09D of Appendix 1, Subpart P, Regulations No.4 with an onset date of June 21, 2004.  (Tr. 8).  The Appeals Council issued a decision  on June 16, 2006,  adopted the ALJ's ruling for the period from December 21, 2001 through June 21, 2004. (Tr. 8-11). However, for the period beginning on June 21, 2004, the Appeals Council found the severity of the Plaintiff's impairment met the criteria of section 13.13A and 13.09B of 20 C.F.R. Part 400, Subpart P, Appendix 1 based upon Dr. Blee's report.  Having exhausted all administrative remedies, the Plaintiff timely filed a Complaint with this Court.

### *Plaintiff's History*

The Plaintiff was born on June 15, 1956, making her forty-five (45) years old on her alleged onset disability date and forty-seven (47) years old at the time of the hearing.  (Tr. 78, 307).  The

Plaintiff has a past relevant work history of store manager, waitress, and grinder (crystal). (Tr. 30). The Plaintiff alleges an onset disability date of December 21, 2001, due to diverticulitis, irritable bowel syndrome (IBS), neck and elbow injuries, breast cancer, incontinence, depression, anxiety and panic disorder. (Tr. 29). The Plaintiff is now deceased.

### *Medical and Psychological History*

On October 13, 1993, the Plaintiff underwent a mental status exam with Dr. Steven R. Machlin upon referral from her therapist, Dr. Roseann Kay Albertario. (Tr. 151). The Plaintiff reported problems with nervousness beginning approximately four (4) years prior. (Tr. 151). The Plaintiff reports experiencing frequent panic attacks, characterized by shortness of breath, tightness in her chest, cold clammy palms, feelings of impending doom, often accompanied by diarrhea. (Tr. 151). Upon examination, the Plaintiff appeared well-groomed with no abnormal psychomotor movements, tics, or dyskinesias. (Tr. 153). Speech was fluent , goal directed, with no evidence of formal thought disorder. (Tr. 153). The Plaintiff's mood was low and her affect was mildly irritable and sullen at times. (Tr. 153). There were no obsessions, compulsions, hallucinations or delusions. (Tr. 153). Dr. Machlin diagnosed the Plaintiff with panic disorder, recurrent depression, agoraphobia with irritable bowl syndrome, hypertension, and history of renal artery stenosis. (Tr. 153).

On January 27, 1994, the Plaintiff presented to Dr. Machlin with complaints of explosive diarrhea believed to occur when she attempts to leave the house. (Tr. 150). The Plaintiff's medications were changed to Amitriptyline 50 mg. and she continued with Xanax.

On May 3, 1994, the Plaintiff returned to Dr. Machlin. (Tr. 150). She reported doing very poorly. (Tr. 150). She was now experiencing diarrhea at home and has been on antibiotics for a month for sinusitis. (Tr. 150). Dr. Machlin recommended a re-evaluation by another

gastroenterologist.   The Plaintiff's mediations were changed to Klonopin and Effexor instead of Amitriptyline.  (Tr. 150).  The Plaintiff continued to be treated by Dr. Machlin.

On September 12, 1994, the Plaintiff presented to Dr. James Cerda of the Shands Teaching Hospital, Gastroenterology Clinic. (Tr. 154).   The Plaintiff complained of flu-like illness,  nausea, vomiting, and explosive diarrhea occurring approximately two to twelve times a day, five or six times a week, alternating with constipation.  (Tr. 154).  Upon physical examination, the Plaintiff was alert and oriented to person, place and time.  (Tr. 154).  The Plaintiff's heart had a regular rate and rhythm. (Tr. 154).  Dr. Cerda concurred with the diagnosis of irritable bowel syndrome.  (Tr. 155).  Dr. Cerda suggested a flexible signoidoscopy and additional tests  to rule out causes such as mal-absorption and pancreatic disease.  (Tr. 155).  Dr. Cerda recommended a high fiber diet and to see a dietician.  (Tr. 155).

On August 13, 1999, the Plaintiff presented to the Lee Memorial Hospital with complaints of abdominal pain.  (Tr. 159).  The Plaintiff received a full diagnostic evaluation and was referred to Dr. Harrison, Urologist, for an outpatient ultrasound.  (Tr. 159).  The Plaintiff could not receive the ultrasound there because it was after hours. (Tr. 159).  The Plaintiff was discharged home and told to follow up with her private physician.  (Tr. 159).

On August 21, 1999, the Plaintiff was admitted to the hospital with abdominal pain.  (Tr. 160).   Her pain was predominantly mid abdominal and somewhat in the left abdomen.  (Tr. 160). A colonoscopy was performed for detection of possible diverticulitis.  (Tr. 160). There was an area in the sigmoid colon of some mild inflammatory change with a small amount of what was felt to be purulent material consistent with diverticulitis.  (Tr. 160).  The Plaintiff was given Cipro 500 mg bid, Inderal, Prevacid, Effexor 75 mg, and hydrochlorothiazide.  (Tr. 160).

In treatment notes dated September 5, 2000, Dr. Machlin reported the Plaintiff's mood was generally good.  (Tr. 141).  The Plaintiff reported experiencing no panic attacks.  (Tr. 141). Treatment remained unchanged and the Plaintiff was scheduled to return in four (4) months.  (Tr. 141).

On January 18, 2001, the Plaintiff returned to Dr. Machlin.  (Tr. 141).  She discussed issues with her mother and foster mother.  (Tr. 141).  The Plaintiff did not report any panic attacks and seemed quite appropriate.  (Tr. 141).  The Plaintiff returned three (3) months later and was doing well. (Tr. 141).  The Plaintiff was taking issues with her foster mother in stride and her husband was supportive. (Tr. 141).  Dr. Machlin continued the Plaintiff's treatment regimen.  (Tr. 141).  Dr. Machlin continued to see the Plaintiff throughout 2001.  (Tr. 140).

On November 29, 2001, the Plaintiff presented to the Riverwalk Breast Center for a mammogram upon referral from Dr. David Nicasio.  (Tr. 191).  A mammogram was previously done on 6/21/01 and was used to compare results.  (Tr. 191).  Results showed a large area of asymmetric density in the upper outer quadrant of the left breast which was visible and did not appear significantly changed. (Tr. 191).  Given the clinical history of the hardening mass and skin retraction, a biopsy of the palpable lesion should be considered.  (Tr. 191).

On December 11, 2001, the Plaintiff presented to Dr. Charles Shook for evaluation of the suspicious mammogram.  (Tr. 193).  Dr. Shook noted the Plaintiff continued to smoke against medical advice.  (Tr 193).  Dr. Shook recommended an excisional biopsy noting the size of the lesion being approximately 5 or 6 cm in length.

On December 21, 2001, the Plaintiff underwent the biopsy procedure. (Tr. 195).  At the time of surgery, much evidence of severe benign disease was noted with inspissated greenish/black mucoid

5

material filling enlarged ducts and small cysts, but the majority of the lesion showed a diffuse firm, whitish change, which was clinically suspicious for carcinoma. (Tr. 195). Frozen section revealed it to be a very diffuse type of invasive carcinoma. (Tr. 195). Dr. Shook opined that given the size of the lesion, the Plaintiff would need a modified radical mastectomy in the future. (Tr. 195). Based upon Dr. Shook's recommendation, on January 7, 2002, the Plaintiff underwent the left modified radical mastectomy. (Tr. 218-222).

On January 16, 2002, the Plaintiff presented to Dr. Lowell Hart of the Florida Cancer Specialists for further evaluation and therapy of her T3-sized breast cancer. Upon examination, the Plaintiff's MediPort and surgical scar seemed to be healing. (Tr. 209). The Plaintiff had no peripheral edema or lymphadenopathy elsewhere and was alert and well oriented. (Tr.209). The Plaintiff was about to begin chemotherapy utilizing a FEC regimen for about six (6) cycles. (Tr. 209). The Plaintiff was to have some chest wall irradiation after the completion of chemotherapy. (Tr. 209). The Plaintiff was also to start on either Tamozifen or Arimidex as a hormonal maneuver. (Tr. 209).

On January 31, 2002,  the Plaintiff presented to Dr. Machlin post mastectomy. (Tr. 140). She explained that she went in for a mammogram where a lump was found. (Tr. 140). The Plaintiff was initially told the lump was benign but later found out it was cancer. (Tr. 140). The Plaintiff started chemotherapy and will subsequently receive radiation therapy. (Tr. 140). The Plaintiff complained of experiencing some insomnia. (Tr. 140). Dr. Machlin reported that if the insomnia continued, he would raise her prescription of Effexor. (Tr. 140). The Plaintiff was handling it in stride and her husband was very supportive. (Tr. 140).

On March 27, 2002, the Plaintiff presented to Dr. Hart for her fourth (4th) cycle of

6

chemotherapy. (Tr. 205). The Plaintiff developed unexplained urinary incontinence. (Tr. 205). Dr. Hart began the Plaintiff on Detrol. (Tr. 205). Medical records show that Dr. Hart continued to monitor the Plaintiff's therapy until June 19, 2002. In a letter dated June 19, 2002, Dr. Hart addressed Dr. Constantine Mantz who administered the Plaintiff's radiation therapy. (Tr. 200). Dr. Hart noted the Plaintiff was experiencing some hot flashes but taking Effexor for relief. (Tr. 200). The Plaintiff had good appetite, stable weight and denies headaches, fevers, chills, sweats, chest pain or abdominal pain. (Tr. 200). Physical examination was normal and the Plaintiff was alert and oriented. (Tr. 200). Dr. Hart opined the Plaintiff was doing quite well. (Tr. 200).

On April 17, 2002, the Plaintiff presented to Dr. Machlin. The Plaintiff had lost her hair, and was suffering from nausea. (Tr .139). The Plaintiff's mood was down somewhat. She stated that she felt overwhelmed at times. (Tr. 139). The Plaintiff was taking Valium which seemed to help. (Tr. 139).

On September 4, 2002, saw Dr. Machlin for a routine appointment. The Plaintiff noted that she had a disability review coming up and that she was not back at work. (Tr. 138). He noted that she had to make two stops on the way to the appointment due to her irritable bowel syndrome. (Tr. 138). The Plaintiff was sleeping okay, her appetite was fair and her hair was growing back. (Tr. 138).

On September 10, 2002, the Plaintiff was referred by the Division of Disability Determinations for a psychological determination. (Tr. 232-236). The Plaintiff reported being out of work since December of 2001, following a diagnosis of breast cancer. (Tr. 233). The Plaintiff reported she is currently depressed and is experiencing sleep trouble and not feeling rested in the morning. (Tr. 233). She reports feelings of hopelessness and feels like everybody is lying to her. (Tr. 233). She further

7

reported difficulty concentrating and reading.  (Tr. 233).  The Plaintiff denied hallucinations.  (Tr. 233).  The Plaintiff stated that she was in counseling for years, beginning when the Irritable Bowel Syndrome (IBS) illness was severe.  (Tr. 233).  At that time, the Plaintiff suffered from agoraphobia but states she is "doing better now".  (Tr. 233).  Upon mental examination, the Plaintiff's attitude was cooperative.  (Tr. 234).  There were no indications of hostility or purposeful withholding of information.  (Tr. 234).  The Plaintiff's mood was depressed and her affect was constricted and congruent with mood.  (Tr. 234).  The Plaintiff was oriented times three with no indications of hallucinations, illusions, delusions, or a formal thought disorder at the time of the assessment.  (Tr. 234).  The Plaintiff's speech was clear, voice was tremulous and fluency and productivity were within normal limits.  (Tr. 234).  Dr. Vincent administered the Digit Span and Digit Symbol subtests of the Wechsler Adult Intelligence Scale-Third Edition.  (Tr. 234).  The Plaintiff scored 1/3 standard deviation below the mean (37th percentile) indicating slight problem in attention, concentration, and immediate auditory memory.  On the Digit symbol subtest, she scored 1 standard deviation below the mean (16th percentile) indicating some problems in sustained attention and psychomotor speed.  (Tr. 234).  The Plaintiff's judgment and insight was good.  (Tr. 234).  Dr. Vincent's diagnostic impression Axis 1 was Major Depressive Disorder, Recurrent, Moderate Severity; Panic Disorder with a history of agoraphobia and polysubstance dependence in sustained full remission.  (Tr. 234).

On August 26, 2002, Dr. Arthur Hamlin completed a Psychiatric Review Technique form.  (Tr. 236-250).  Dr. Hamlin opined  the Plaintiff suffers from anxiety and noted the Plaintiff's panic disorder. (Tr. 241).  Dr. Hamlin reviewed the Plaintiff's records and noted multiple physical problems, status post radical mastectomy, diverticulitis, and mitral valve prolapse.  (Tr. 248).  The Plaintiff presented cooperative, with no psychotic features, depressed mood with anxious features, and

constricted affect, clear voice, which was slightly tremulous, intact gross cognitive functioning with only slight problems in attention/concentration/immediate auditory memory, and good insight. (Tr. 248). B criteria functioning indicates that the Plaintiff was capable of doing a variety of household tasks, preparing food and grocery shopping with only physical limitations. (Tr. 248). Dr. Hamlin opined although the Plaintiff does not get out much due to anxiety, she gets along with authority figures and those in public. (Tr. 248). Dr. Hamlin concluded evidence suggested a history of depression with moderate severity, although daily functioning does not appear significantly impacted due to her Axis 1 psychopathology. (Tr. 248). The Plaintiff was considered "non-severe". (Tr. 248).

On September 27, 2002, Dr. Hamsaveni Kambam, a state agency consultant, completed a physical residual functional capacity assessment. (Tr. 250-257). It was concluded the Plaintiff was capable of lifting twenty (20) pounds occasionally, frequently lifting ten (10) pounds, stand and/or walk six (6) hours in an eight (8) hour work day, sit about six (6) hours in an eight (8) hour work day, and had no limitations on pushing or pulling. (Tr. 251). The Plaintiff was occasionally limited in climbing, balancing, stooping, kneeing, crouching, and crawling. (Tr. 252).

On January 14, 2003, Dr. Michael Stevens completed a psychiatric review technique form. (Tr. 258-273). Dr. Stevens opined the Plaintiff's impairments were considered non-severe. (Tr. 258). Dr. Stevens further opined the Plaintiff suffered from a disturbance of mood and had a medically determinable impairment of moderate depression, anxiety, and panic disorder. (Tr. 261, 263). The Plaintiff was found to have mild restrictions of activities of daily living, difficulties in maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. 268). Dr. Stevens concluded that the Plaintiff was stable and non-severe. (Tr. 270).

On February 14, 2003, the Plaintiff presented to Dr. Rajan Sareen of the Family Medical

Clinic with complaints of frequent episodes of diarrhea on a daily basis, panic and anxiety episodes, right arm pain, back and neck pain, chest pain. (Tr. 273). The Plaintiff was alert, oriented and not in any distress. (Tr. 273). Upon examination, Dr. Sareen opined the Plaintiff's diarrhea was secondary to diverticulitis and IBS. (Tr. 274). The Plaintiff also suffered from anxiety and depression. (Tr. 274). The Plaintiff's back pain was chronic. (Tr. 274). The Plaintiff's complaints of chest pain and left arm numbness were probably secondary to the surgical scar secondary to breast cancer and a left breast mastectomy. (Tr. 274). The Plaintiff's urinary incontinence was secondary to renal disease. (Tr. 274). The Plaintiff was also capable of handling funds independently. (Tr. 274).

On May 10, 2004, the Plaintiff returned to Dr. Machlin. (Tr. 132). The Plaintiff complained of being depressed and anxious. (Tr. 132). She stated her IBS was doing terrible ever since an episode of food poisoning. (Tr. 132). The Plaintiff was experiencing fecal incontinence and very frequent explosive stools and had to carry a portable potty. (Tr. 132). Dr. Machlin recommended another GI evaluation. (Tr. 132). The Plaintiff's medications were changed due to lack of response and began a trial of Remeron in the hopes of helping her with her GI complaints and insomnia (Tr. 132).

On June 21, 2004, the Plaintiff underwent a chest x-ray which revealed a mass in her right lung. (Tr. 292). In a letter dated June 30, 2004, Dr. Hart indicated that attempts to contact the Plaintiff were unsuccessful. (Tr. 292). Dr. Hart, in a letter to Dr. Randall Buss of the Florida Cancer Specialists, stated that the Plaintiff showed evidence of possible right hilar lymphadenopathy. (Tr. 289). The Plaintiff remained a heavy smoker. (Tr. 289). Dr. Hart recommended up front chemotherapy and possible surgery at a later date. (Tr. 289). Despite the efforts of physicians, the

Plaintiff passed away on June 8, 2005.

*Administrative Law Judge's Decision*

Upon consideration of the record, the ALJ found the Plaintiff met the disability insured status requirements on December 21, 2001, the onset disability date, and has sufficient quarters of coverage to remain insured through at least June 30, 2007. (Tr. 37). The ALJ determined the Plaintiff has not engaged in substantial gainful activity since December 21, 2001. (Tr. 37). The ALJ found the medical evidence established the Plaintiff has status post mastectomy of the left breast, status post renal angioplasty, incontinence, irritable bowel syndrome (IBS), and mitral valve prolapse as "severe impairments." However, the ALJ concluded impairments whether considered singly or in combination, do not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 37). The ALJ found the Plaintiff's statements concerning her impairments and their impact on her ability to work are not entirely credible. (Tr. 38). The ALJ determined the Plaintiff retains the residual functional capacity to perform the exertional demands of a minimally reduced range of light work. (Tr. 38). The ALJ found the Plaintiff has non-exertional limitations which minimally narrow the range of work she is capable of performing. (Tr. 38). The ALJ noted the Plaintiff was forty-five (45) years of age on her alleged onset disability date, therefore, she is considered a "younger individual" within the meaning of the Regulations. (Tr. 38). The ALJ further noted the Plaintiff has a high school equivalency (GED) education. (Tr. 38). Considering the Plaintiff's age, educational background, and residual functional capacity, the ALJ found the Plaintiff is able to make a successful vocational adjustment to work that exits in significant numbers in the national economy. (Tr. 38). The ALJ stated examples of such work include ticket seller, office helper, and order clerk. (Tr. 38). Accordingly, the Plaintiff was not under a disability as defined in

the Social Security Act, at any time through the date of the decision. (Tr. 38).

## THE STANDARD OF REVIEW

### A. Affirmance

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 28 L. Ed 2d 842 (1971). In evaluating whether a claimant is disabled, the ALJ must follow the sequential inquiry described in the regulations[3]. See 20 C.F.R. §§ 404.1520(a), 404.920(a). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla-*i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982)); Richardson, 402

---

[3]The inquiry requires the ALJ to engage in a five-step analysis, which will either preclude or mandate a finding of disability. The steps are as follows:
   *Step 1.* Is the claimant engaged in substantial gainful activity? If the claimant is engaged in such activity, then he or she is not disabled. If not, then the ALJ must move on to the next question.
   *Step 2.* Does the claimant suffer from a severe impairment? If not, then the claimant is not disabled. If there is a severe impairment, the ALJ moves on to step three.
   *Step 3.* Does the claimant's impairment meet or equal one of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. If so, then the claimant is disabled. If not, the next question must be resolved.
   *Step 4.* Can the claimant perform his or her former work? If the claimant can perform his or her past relevant work, he or she is not disabled. If not, the ALJ must answer the last question.
   *Step 5.* Can he or she engage in other work of the sort found in the national economy? If so, then the claimant is not disabled. If the claimant cannot engage in other work, then he or she is disabled. See 20 C.F.R. §§404.1520(a)-(f), 416.920(a)-(f); see also Phillips v. Barnhart, 357 F.3d 1232, 1237-40 (11th Cir. 2004); Foote v. Chater, 67 F.3d 1553, 1557 (11th Cir. 1995) (per curiam).

U.S. at 401.

Where the Commissioner's decision is supported by substantial evidence, the District Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. Edwards v. Sullivan, 937 F.2d 580, 585 n.3 (11th Cir. 1991); Barnes v. Sullivan, 932 F.3d 1356, 1458 (11th Cir. 1991). The District Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. Foote, 67 F.3d at 1560; Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir 1992) (holding the court must scrutinize the entire record to determine reasonableness of factual findings).

The court "may not decide the facts anew, reweigh the evidence or substitute it's judgment for that of the [Commissioner]."Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). If the Commissioner's decision is supported by substantial evidence, it should not be disturbed. Lewis v. Callahan, 125 F. 3d 1436, 1440 (11th Cir. 1997).

**B. Reversal and Remand**

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405 (g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. Keeton v. Department of Health and Human Services, 21 F.3d 1064, 1066 (11th Cir. 1994); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner, and order an award of disability benefits, where the Commissioner has already considered the essential evidence

13

and it is clear that the cumulative effect of the evidence establishes disability without any doubt. Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).  The district court may also remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405 (g); under sentence six of 42 U.S.C. § 405 (g); or under both sentences. Jackson v. Chater, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).

To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. Jackson, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); Davis, 985 F.2d at 534 (remand to the Secretary is warranted where the ALJ has failed to apply the correct legal standards).  Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. Falcon v. Heckler, 732 F.2d 827, 830 (11th Cir. 1984). (remand was appropriate to allow ALJ to explain the his basis of his decision).

On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence upon a showing that there is new evidence which is material and that there was good cause for the failure to incorporate such evidence into the record during a prior proceeding. Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983)(finding ALJ error and remanding to consider psychiatric evaluation); Reeves v. Heckler, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (remanding on the grounds that it is reversible error for the ALJ not to order a consultative examination when warranted). After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. Jackson, 99 F.3d at 1095.

14

In contrast, a sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. Jackson, 99 F.3d at 1095. Sentence six of § 405 (g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405 (g) (sentence six). To remand under sentence six, the claimant must establish: 1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level. Jackson, 99 F.3d at 1090 - 92; Keeton v. Dept. of Health and Human Serv., 21 F.3d 1064, 1068 (11th Cir. 1994). With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. Jackson, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[4] Id.

## C.  **Standard of Review for Evidence Evaluated by the Appeals Council**

Congress left the term "final decision" undefined in 42 U.S.C. § 405 (g). Where a claimant exhausts his administrative remedies by requesting review by the Appeals Council and the Appeals Council then denies review, the Appeals Council's order denying review is a "final decision" of the

---

[4]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. Jackson, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. Id. In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. Id.

Commissioner under § 405 (g). Sims v. Apfel, 530 U.S. 103, 106-107, 120 S.Ct. 2080, 147 L. Ed. 2d 80 (2000); Bloodsworth, 703 F.2d at 1239.  The Appeals Council "will" review a case if there appears to be an abuse of discretion by the ALJ, if there is an error of law, or if the ALJ's action, findings, or conclusions are not supported by substantial evidence. 20 C.F.R. § 416.1470; Sims, 530 U.S. at 111; Parker v. Bowen, 788 F.2d 1512, 1518 (11th Cir. 1986) (en banc).  The Appeals Council's denial of review is subject to judicial review to determine if it is supported by substantial evidence. Sims, 530 U.S. at 111.

Just as the ALJ has a duty to investigate the facts and to develop the arguments both for and against the granting of benefits, the Appeals Council's review is similarly broad. Id. at 111-112. When the Appeals Council refuses to consider new evidence submitted to it and denies review, the Appeals Council's decision denying review is subject to judicial review. 20 C.F.R. § § 404.970 (b); 416.1470 (b); Keeton, 21 F.3d at 1066.  Furthermore, the Appeals Council commits reversible error when it refuses to consider new evidence if that evidence was available at the time of or prior to the ALJ's hearing and then denies review. Id. at 1066.  Similarly, it is reversible error for a district court to consider only the evidence presented to the ALJ — and to ignore the new evidence presented to the Appeals Council — in reviewing a decision of the Appeals Council. Id.  The Appeals Council must consider and evaluate new evidence to determine whether there is a basis for changing the ALJ's decision. Falge v. Apfel, 150 F.3d 1320, 1322 n. 4 (11th Cir. 1998). When the Appeals Council has denied review, the district court looks only to the evidence actually presented to the ALJ in determining whether the ALJ's decision is supported by substantial evidence. Id. at 1323; Eads v. Secretary of Health and Human Services, 983 F.2d 815, 817 (7th Cir. 1993) (ALJ cannot be faulted for failure to weigh evidence never presented to him). The Eleventh Circuit directs the district courts

to consider evidence submitted to the Appeals Council in reviewing the Appeals Council's denial of review. Falge, 150 F.3d at 1324; Keeton, 21 F.3d at 1066.  Indeed, it makes sense that Congress has provided for judicial review of the Commissioner's final decision — the last step of review necessary to exhaust administrative remedies.  When the Appeals Council refuses to consider new evidence submitted to it, the Appeals Council's decision denying review is subject to judicial review for error. Id.  Similarly, when the Appeals Council denies review of an ALJ's decision after receiving, considering, and evaluating new and material evidence that clearly and thoroughly undermines the ALJ's findings of fact and conclusions of law, the Appeals Council's decision denying review also must be subject to judicial review for error. 20 C.F.R. § 404.970 (b) (Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the relevant period, and it will then review the case if it finds that the ALJ's action, findings, or conclusion is contrary to the weight of the evidence currently of record); Falge,150 F.3d at 1324; Keeton, 21 F.3d at 1066, 1068.  The Commissioner cannot avoid judicial review of the Appeals Council's decision to deny review by considering but not acting on new evidence that is highly probative of disability, or by considering but not acting on evidence that shows in retrospect that an ALJ's action, findings, or conclusion are contrary to the weight of the evidence currently of record.

## THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416 (I), 423 (d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists

in the national economy. 42 U.S.C. § 423 (d)(2); 20 C.F.R. §§404.1505 - 404.1511.

## DISCUSSION

The Plaintiff argues the Appeals Council relied upon the ALJ's reasoning in finding the Plaintiff could work at a light exertional level prior to June 21, 2004.  In denying Plaintiff benefits, the ALJ relied on a response from the vocational expert (VE) to a hypothetical question that failed to state all of the Plaintiff's specific limitations.  The Plaintiff argues the ALJ was in error, and thus the Appeals Council's finding were in error regarding the Plaintiff's residual functional capacity prior to June 21, 2004. The Commissioner argues substantial evidence supports the Appeals Council's finding that Plaintiff was not disabled prior to June 21, 2004.

### *Whether the ALJ Erred by Relying on the Vocational Expert's Response to an Inaccurate Hypothetical Question*

The Plaintiff argues the Appeals Council improperly relied upon the ALJ's reasoning finding that Plaintiff could work at a light exertional level prior to June 21, 2004.  In denying Plaintiff benefits, the ALJ relied on a response from the vocational expert (VE) to a hypothetical question that failed to state all of the Plaintiff's specific limitations.  The Plaintiff argues since the ALJ is in error, the Appeals Council's findings are in error regarding the Plaintiff's residual functional capacity prior to June 21, 2004.

Hypothetical questions asked by the ALJ to the vocational expert must describe comprehensively the claimant's impairments. Loveless vs. Massanari, 136 F.Supp.2d 1245, 1250 (M.D. Ala. 2001) (citing Pendley v. Heckler, 767 F.2d 1561, 1652 (11th Cir. 1985) (*per curiam*)). If the hypothetical question upon which the vocational expert bases his evaluation does not assume all of a claimant's impairments, the decision of the ALJ denying a claimant's application for disability

insurance benefits, which is based significantly on the expert testimony, is not supported by substantial evidence.  Loveless, 136 F.Supp.2d at 1250.  Notwithstanding, the foregoing general standard, the hypothetical question posed by the ALJ may omit non-severe impairments.  Id.

In the instant case, the ALJ found the Plaintiff retained the residual functional capacity for light work, and therefore, was capable of returning to her past relevant work as she described it and as it is performed in the national economy.  The ALJ also relied on a vocational expert (VE) who testified  the Plaintiff had acquired work skills that may be used to meet the demands of jobs within her residual functional capacity.  The ALJ presented the vocational expert with the following hypothetical question:

> I'd like you to assume that I find the claimant has the ability to perform work related functions subject to the following limitations and restrictions: limited to frequent lifting and carrying 10 pounds, occasionally 20 pounds; pushing and pulling with the left arm is limited to frequent; she's right-hand dominant, reaching with the left arm, both waist to chest and abo e the shoulder also limited to frequent, left arm; limited to frequent balancing, stooping, kneeling, crouching, crawling; occasional climbing, occasional climbing ramps and stairs; should avoid climbing ladders, ropes, scaffolding; should avoid unprotected heights and being around moving and hazardous machinery.  And my question to you, sir, is can she perform any of her past relevant work, either as she performed it or is actually performed or as customarily performed in the national economy?  (Tr. 331).

The VE opined the Plaintiff "certainly...could perform that job she had as a store manager, and as she described the job, that of the grinder operator."  (Tr. 331).  He did, however, have some reservation as to whether she could work as a waitress because of the possibility of carrying heavy trays.  Although, he noted, the Plaintiff had previously worked at Pizza Hut which only required her to carry pitchers of soda at the heaviest and was able to perform that job.(Tr. 331)

The ALJ then stated and then inquired:

> The claimant is a younger individual, she has a high school or more education, her work has been at the skilled and the semi-skilled level. I'd like you to assume a hypothetical claimant, one that has the same education, age and previous work history as the claimant, and one that has the exertional and non-exertional limitations that I originally described, would there be any unskilled, SVP1 or 2 jobs that this hypothetical person could perform?

The VE testified that assuming the Plaintiff's specific restrictions there would be many, including but not limited to a ticket seller[5], order clerk[6], and an office helper[7]. (Tr. 332). The ALJ also asked the VE whether or not in his review of the file he observed any vocationally relevant factor the ALJ had not adequately covered to which the VE responded "No". (Tr. 332).

The ALJ accepted the VE's testimony concerning the existence of jobs that accommodate the Plaintiff's exertional limitations. (Tr.37). He found the VE's testimony was based on a hypothetical supported by the evidence and the VE's extensive knowledge of and experience in the local, regional, and national job markets. (Tr. 37). He further found the VE's testimony showed careful analysis of the Plaintiff's impairments and limitations and he established there are a significant number of jobs in the local and national economies the Plaintiff could perform despite her limitations. (Tr. 37). The ALJ ultimately concluded the Plaintiff retains the capacity to return to her past relevant work, and, also, to make an adjustment to work which exists in significant numbers in the national economy. (Tr. 37). The ALJ found because the claimant is capable of performing her past relevant work and also

---

[5]DOT number 211.467-030, sedentary with an SVP of 2, 300 in the local economy, 8,000 in the state economy, 175,000 in the national economy. (Tr. 332).

[6]DOT number 209.567-014, sedentary, SVP of 2, 30 in the local economy, 500 in the state economy, 10,000 in the national economy.

[7] DOT number 239.567-010, SVP of 2, 100 in the local economy, 1000 in the state economy, 65,000 in the national economy.

capable of making an adjustment to other work, she is not disabled within the meaning of the Social Security Act.

The Plaintiff argues the ALJ should have included panic attacks as well as her urinary and fecal incontinence as specific limitations and impairments when inquiring of the VE whether or not she could perform her past relevant work and/or whether or not she could perform other jobs that exist in significant numbers in the national economy. To determine whether or not these limitations should have been included in the hypothetical, it is important to examine the ALJ's analysis of the Plainitff's impairments.

## *Panic Attacks*

Regarding the panic attacks, the ALJ notes the Plaintiff began seeing Dr. Machlin for panic attacks as early as 1993. (Tr. 31). In treatment notes dated September 5, 2000, Dr. Machlin relates the Plaintiff's mood has been generally good and there have been no panic attacks. (Tr. 31). In January, 2001, Dr. Machlin reported the Plaintiff was not having any panic attacks. (Tr. 31). The ALJ goes on to report that on September 5, 2001, the Plaintiff's mood had been stable, and she had had no panic attacks. (Tr. 31). On January 31, 2002, Dr. Machlin noted that Valium had been quite effective for the Plaintiff's anxiety. (Tr. 31). Dr. Machlin reports throughout his clinical notes that the Plaintiff is being maintained on her medications, and is in "good spirits". (Tr. 31). He also notes in the record that the Plaintiff travels regularly to visit with her son and grandchildren and has even been on vacation to Italy. (Tr. 31). Dr. Machlin reported on July 21, 2003, the Plaintiff felt her medications were working well. (Tr. 31). Therefore, the ALJ concluded the Plaintiff's medical records report that her depression and panic attacks are treated with medication and should be considered "non-severe." He found "The claimant's subjective complaints of... panic attacks are also

21

controlled with medication, and would result in only mild difficulties in maintaining social functioning, with only mild deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner." (Tr. 32).  He found although the Plaintiff may view [this condition] as problematic, objectively [it is] not severe.  (Tr. 32).  Because the ALJ discounted the panic attacks in his analysis, he need not include them in his hypothetical question to the VE.

### Urinary and Fecal Incontinence

Regarding urinary and fecal incontinence, the ALJ notes although the Plaintiff alleges disability due to incontinence, the doctors at Lee Memorial Physician Group note this alleged problem is controlled with treatment and medication.  (Tr. 32).  He notes although the Plaintiff alleges she must use the restroom "10 - 15 times a day" and she has "accidents", treatment notes report her alleged impairments are stable and respond to medication. (Tr. 33).   The ALJ also cites to a urology consult with Dr. Paletsky on June 11, 2002, where Dr. Paletsky noted some stress urinary incontinence and urge urinary incontinence.  (Tr. 34).  As a result of the examination, Dr. Paletsky recommended the TVT (tension - free vaginal tape) procedure which he felt would rectify the Plaintiff's symptoms.  However, the ALJ specifically noted "there are no records in the file that state the claimant followed-up on Dr. Paletsky's recommendations." (Tr. 34).  In order to get benefits, a claimant must follow a prescribed treatment plan if that treatment could restore the claimant's ability to work. 20 C.F.R. § 404.1530(a); Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003).

Further, the ALJ notes the Plaintiff reported she is able to handle her personal hygiene needs. (Tr. 35).  Despite her alleged complaints of bladder incontinence and IBS, the ALJ noted the Plaintiff testified she does drive at least 4 times a week.  (Tr. 35).  The ALJ also noted there is no evidence the Plaintiff  requires around the clock assistance for daily living; on the contrary, her testimony and

22

the evidence support the fact that she functions independently.  (Tr. 35).  Because the ALJ discounted the bladder incontinence and IBS as severe, he need not include them in his hypothetical to the VE.

The Court finds that in denying Plaintiff benefits, the ALJ relied on a response from the vocational expert (VE) to a hypothetical question which included all of the Plaintiff's specific limitations.  Thus, the Appeals Council's reliance on the ALJ's findings regarding the Plaintiff's residual functional capacity prior to June 21, 2004, were proper.  Substantial evidence supports the Appeals Council's finding that Plaintiff was not disabled prior to June 21, 2004.

Accordingly it is hereby

**RESPECTFULLY RECOMMENDED:**

The Final Decision of the Commissioner of Social Security Denying the Plaintiff's Claim for Disability Insurance Prior to June 21, 2004, should be **AFFIRMED.**

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**DONE AND ORDERED** at Fort Myers, Florida, this __18th__ day of May, 2007.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies:  Counsel of record, MJCD

23